UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER ADAM SANDERS,

Petitioner,

v.

SCOTT FRAUENHEIM, Warden,

Respondent.

Case No. 17-05008 BLF (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state conviction. Respondent filed an answer on the merits. Dkt. No. 10. Petitioner has filed a traverse. Dkt. No. 17. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

## I. BACKGROUND

On May 12, 2011, a jury convicted Petitioner of: (1) lewd and lascivious acts upon a minor under age 14, *see* Cal. Penal Code § 288(a); (2) two counts of lewd and lascivious acts upon a minor by use of force or duress, *see* Cal. Penal Code § 288(b)(1); (3) three or

more acts of substantial sexual contact with a minor under age 14 by a resident molester, *see* Cal. Penal Code § 288.5(a), and (4) unlawful sexual intercourse with a minor under age 16, *see* Cal. Penal Code § 261.5(d). Dkt. Nos. 11-2 at 76; 11-3 at 96-100. On January 13, 2012, the Court sentenced Petitioner to a term of 41 years in state prison. Dkt. No. 11-3 at 184-86, 188-89.

On August 19, 2013, the California Court of Appeal affirmed the judgment. Dkt. No. 11-8 at 133-45. On November 26, 2013, the California Supreme Court denied a petition for review. Dkt. No. 11-8 at 191. Petitioner filed unsuccessful state petitions for writ of habeas corpus in Lake County Superior Court, the California Court of Appeal, and the California Supreme Court. Dkt. No. 11-8 at 392, 454-59, 466.

Petitioner filed the instant habeas petition on August 29, 2017. Dkt. No. 1.

## II. STATEMENT OF FACTS

The following background facts are from the opinion of the California Court of Appeal on direct appeal:

> K.H. was born in December 1993. She met defendant when she was 10 or 11 years old. He dated her mother and they began living together. K.H. first lived with them in a house in Lower Lake. Defendant and K.H.'s mother married; defendant became K.H.'s stepfather in 2007. They lived in Lower Lake for a year before moving to a house on Buckeye Street in Clearlake. Defendant's daughter, and K.H.'s younger sister also lived in the house. They lived there for about seven months to a year before moving to Hidden Valley for a year and then to Utah Street in Clearlake for about a year. When K.H. was in the eighth grade, they moved to a house on Verna Way in Lucerne. K.H. testified that defendant committed numerous acts of sexual molestation against her at their various residences.
>
> **(a) The Buckeye Incidents**
>
> The first incident occurred during the summer when K.H. was 11 years old. Defendant was playing a tickling game with her which went "too far." He started to tickle her but then put his hands down her pajama pants

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

2

and touched her vagina with a rubbing motion. Defendant penetrated her vagina with his finger and asked her if it tickled. K.H. felt uncomfortable but did not know what to do. The following day defendant told her not to tell anyone about the incident. He said that if anyone found out, they would both be put in jail and she would never see her mother again.

About a week later, defendant came into the bedroom that K.H. shared with her sister in the middle of the night. He crawled into K.H.'s bed and woke her up, and started to tickle her. He pulled down her pajama pants and her underwear, put his fingers in her vagina and then tried to have sexual intercourse with her for about five minutes. K.H. testified that defendant penetrated her vagina a little but not fully because it caused her pain. K.H. said "ouch" and defendant stopped, saying "maybe another time." K.H. did not tell anyone about the incident because she was scared. Defendant told her she would be taken away from her mother.

K.H. testified that defendant molested her several times when they were living on Buckeye Street. She could not remember certain times "because it just happened so frequently." She did testify, however, that defendant tried to have sexual intercourse with her again while she was sleeping in her room. He crawled into bed with her and began rubbing her leg and her back. He took off her pajama pants and tried to put his penis in her vagina. It hurt and K.H. kept saying, "ouch" but defendant persisted. He also touched her vagina with his fingers. He was not wearing a condom and he did not ejaculate.

Defendant tried to have sexual intercourse with her frequently. His penis eventually "fit and it didn't hurt that much any more." He would also touch her breasts when he engaged in sexual intercourse with her.

Defendant also orally copulated K.H. K.H.'s mother was at work; defendant was in charge of K.H. and her sister when their mother was at work. The incidents of sexual molestation occurred about three times per week. K.H. also orally copulated defendant but did not recall when or how many times it happened.

K.H. did not tell anyone about the instances of sexual abuse because she was scared and afraid of getting in trouble. Defendant had told her that she would be taken away and would never see her mother or her family.

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

### (b) Hidden Valley Incidents

In the sixth grade, K.H. moved to a house on Deer Hollow Road in Hidden Valley. She lived with her younger sister, her mother, defendant, defendant's daughter, and Richard B., defendant's friend. Defendant would come into K.H.'s bedroom in the mornings before he went to work and engage in sexual intercourse with her. The incidents occurred more frequently than at Buckeye, and happened almost every day during the work week. He also orally copulated her during this period though she could not recall how often. Defendant rarely used a condom when he engaged in sexual intercourse with her.

### (c) Clearlake Incidents

When K.H. was 13 years old, she lived on Utah Street in Clearlake with her younger sister, her mother, defendant and his daughter, and Richard B. Defendant continued to sexually abuse her but not as often because she would cry afterwards. She felt "really, really bad" and didn't want to wake up. Defendant told her, "We can stop this if you want." K.H. responded that she wanted to stop, but defendant would continue the abuse the following week. She thought about telling someone about the abuse but she was scared of losing her family and her mother.

### (d) Lucerne Incidents

K.H. moved to Verna Way in Lucerne with her family when she was almost 14 years old. Defendant continued to have sexual intercourse with her, and some oral copulation. The abuse occurred about once a week.

In January 2009, K.H. told her mother about the abuse. K.H.'s friend had been raped on New Year's Day and K.H. wanted her mother's advice on how she could help. When K.H. explained why S.W. had not reported the rape to anyone, K.H. said, "It's not that easy." Her mother asked, "What are you talking about?" K.H. then told her mother that defendant had been sexually abusing her. That same day, they reported the abuse to the police. At Officer Hobb's direction, K.H. placed a pretext call to defendant.

### (e) Corroborating evidence

Amy Sanders, K.H.'s mother, testified that she met defendant in 2004. She began living with defendant in August 2004, and they were

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

4

married in February 2007. In September 2004, she and her children moved into an apartment with defendant in Lower Lake. There were times when defendant watched her children. Sanders worked long hours at her job and often worked overtime and on weekends. Her children were consequently often left alone with defendant.

They lived on Verna Way in Lucerne beginning in September 2008. In December 2008, she was looking for defendant at home when she found him in the bedroom lying down on a bed with K.H. with his arms and legs wrapped around her. Sanders tapped defendant on the shoulder because it looked like he and K.H. were sleeping. Defendant rolled out of bed and Sanders saw that he had an erection. She started to yell at him and asked him what he was doing next to her daughter with a "hard on." Defendant claimed that he had fallen asleep and woke up with an erection. Sanders thought maybe she had overreacted because defendant had said he was asleep.

On January 4, 2009, K.H. had just returned home from a visit with her grandmother and was showing Sanders her new jeans. Sanders told K.H. that she needed to take care of the jeans; K.H. had previously lent a friend a pair of jeans that had been returned with the zipper ripped out. K.H. then told Sanders that her friend had been raped and that was how the jeans were ripped. Sanders said that they needed to contact the police. K.H. became upset and said "Well, these things aren't that easy to talk about." Sanders thought something might have happened to K.H., too, so she asked her to tell her what happened. K.H. ran to her room and was very upset. Sanders begged her to tell her what happened. K.H. responded, "I don't want you guys to get a divorce." Sanders realized that defendant had done something to K.H. When she confirmed with K.H. that defendant had raped her, they left the house. Sanders testified that K.H. did not have any boyfriends and did not go on dates.

Officer Hobbs interviewed K.H. and Sanders on January 4, 2009. Hobbs asked K.H. to make a pretext call to defendant to see if he would make any admissions over the phone. An audiotape of the telephone conversation was played for the jury. During the call, the following colloquy occurred: "[K.H.]: She thinks that I'm having sex. [¶] [DEFENDANT]: Are you freaking kidding me? [¶] [K.H.]: Yeah. Have you told mom about anything? [¶] [DEFENDANT]: No. Where the hell is everybody? Where the hell has everybody been? [¶] [K.H.] I don't know. [¶] [DEFENDANT]: You don't know? [¶] [K.H.]: You didn't tell

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

5

mom anything? [¶] [DEFENDANT]: Nobody'd know. [¶] [K.H.]: You haven't told her anything about us? [¶] [DEFENDANT]: No."

The conversation continued, with defendant inquiring about where K.H. and Sanders were because they had been gone from the house for four hours. K.H. then said, "Um . . . are you sure you haven't told mom anything? [¶] [DEFENDANT]: Positive. I wouldn't I wouldn't tell mom anything like that. [¶] [K.H.]: Can we stop doing this then? [¶] [DEFENDANT]: Yeah. [¶] [K.H.]: Kay. [¶] [DEFENDANT]: Yeah for real."

Hobbs interviewed defendant the following day. An audiotape of the interview was played for the jury. Initially defendant denied any sexual abuse, but he subsequently claimed that K.H. initiated sexual contact with him. He admitted that K.H. manually stimulated his penis until he ejaculated; that he had sex with K.H. ten times, that she had orally copulated him twice, that he had orally copulated her twice, and that they had sexual intercourse on two occasions. He said that the incidents were consensual.

Roberta Bell, a registered nurse, conducted a sexual assault examination of K.H. on January 8, 2009. She found that K.H. had six clefts or healed lacerations on her hymen, and a hematoma, a deep bruise on the right side of her hymen. K.H.'s vagina also had granulation tissue which showed that the skin on the vagina was healing from abrasion. She opined that the hematoma that was on the cleft at the right edge of K.H.'s hymen was at most four weeks old. Bell suspected that the other clefts were older. Bell testified that her examination of K.H. was consistent with K.H.'s history of digital penetration and sexual intercourse.

### (f) Defense evidence

Defendant testified on his own behalf. He denied that he sexually molested K.H. He claimed that he confessed during the interrogation by Hobbs because he believed Hobbs had given him only two options — to admit he was a rapist or admit consensual sexual relations with K.H. He was not given the option to say nothing happened. Defendant claimed that he started "making up stuff" that Hobbs wanted to hear.

In rebuttal, the prosecution played a tape of a telephone conversation defendant made to his mother while he was in jail. When his mother asked him why the police were accusing him, defendant responded, "Well, let me

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

6

tell you this, mom, she's come after me sexually when she wanted something."

*People v. Sanders*, No. A134386, 2013 WL 4470551, at *1-*4 (Cal. Ct. App. Aug. 19, 2013).

## III. DISCUSSION

### A.   <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably"

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## B.    Claims and Analyses

Petitioner raises the following five claims in this federal habeas petition: (1) the California Court of Appeal failed to issue an order to show cause in Petitioner's state habeas petition; (2) trial counsel rendered ineffective assistance by failing to consult with an expert witness, i.e. a forensic sexual assault nurse examiner; (3) the trial court's denial of Petitioner's request for funds for Dr. Leo, a false confessions expert, violated Petitioner's constitutional rights; (4) appellate counsel rendered ineffective assistance by failing to file a timely state habeas petition in Superior Court; and (5) the cumulative effect of the errors resulted in prejudice.

Respondent answers all the claims and also argues that Claims 1, 2, and 5 are procedurally defaulted. The Court will first address the procedural default argument, and then address each claim below.

### 1.    Procedural default

Respondent argues that Claims 1, 2, and 5 are procedurally defaulted because the Superior Court denied the claims as untimely in Petitioner's state habeas petition.

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

8

Petitioner responds that his state post-conviction counsel was ineffective for failing to raise them in a timely manner, thus excusing Claims 1, 2, and 5 from default.

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Id.* at 750.

The Ninth Circuit has determined that California's timeliness rule is independent, *Bennett v. Mueller*, 322 F.3d 573, 582-83 (9th Cir. 2003), and the Supreme Court has stated that it is adequate, *Walker v. Martin*, 562 U.S. 307, 321-22 (2011). It thus may be the basis for a federal district court to hold that a claim in a federal petition that was rejected for untimeliness in the California courts is procedurally defaulted.

Federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court announced an equitable rule by which cause may be found for excusing a procedurally defaulted claim of ineffective assistance of trial counsel where a petitioner could not have raised the claim on direct review and was afforded no counsel or only ineffective counsel on state collateral review.

Petitioner argues that he satisfies the exception in *Martinez*. In *Martinez*, the Supreme Court announced that a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of trial counsel "where state law requires prisoners to raise claims of ineffective assistance of trial counsel 'in an initial-

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

9

review collateral proceeding,' rather than on direct appeal" and "the default results from the ineffective assistance of the prisoner's counsel in the collateral proceeding." *Id.* at 16-17. The *Martinez* Court clarified that to demonstrate cause for a procedural default, a petitioner must show that his post-conviction counsel was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984), and that the underlying ineffective assistance of trial counsel claim is a substantial one. *Id.* at 14. To demonstrate the substantiality of the underlying ineffective assistance of trial counsel claim, the petitioner must demonstrate that the underlying claim has some merit. *Id.*

The Ninth Circuit has indicated that because procedural bar issues "are not infrequently more complex than the merits issues presented by the appeal . . . it may well make sense in some instances to proceed to the merits if the result will be the same." *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002); *see also Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be. Judicial economy might counsel giving [a merits question] priority . . . if it were easily resolvable against the habeas petitioner."); *cf.* 28 U.S.C. § 2254(b)(2) (permitting a federal court to deny a habeas petition on the merits notwithstanding the applicant's failure to exhaust state remedies).

In this case, the Court finds that the interests of judicial economy support addressing the merits of Petitioner's Claims 1, 2, and 5 without first determining whether the claims are procedurally defaulted. As Claims 1, 2, and 5 fail on the merits, the result is the same as if the claims were procedurally barred. *See Lambrix*, 520 U.S. at 525.

### 2. Court of Appeal's failure to issue an order to show cause (Claim 1)

Petitioner had filed an original state habeas petition in the California Court of Appeal. Dkt. No. 1 at 14. The California Court of Appeal summarily denied the petition without issuing an order to show cause. Dkt. Nos. 1 at 14; 1-1 at 3. In Petitioner's federal habeas petition, Petitioner claims that the California Court of Appeal violated state law by

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

failing to issue an order to show cause.  Dkt. No. 1 at 20-23.

Respondent argues, and this Court agrees, that Petitioner has failed to state a cognizable claim for relief.  "[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).  The Supreme Court has repeatedly held that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  It also is unavailable for alleged errors in the state post-conviction review process. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam).

Petitioner is not entitled to habeas relief based on this claim.[1]

### 3.    Ineffective assistance of trial counsel (Claim 2)

Petitioner claims that trial counsel rendered ineffective assistance by failing to consult with a sexual assault forensic expert to counter the prosecution's expert, Nurse Bell.  Dkt. No. 1 at 23.  Specifically, Petitioner alleges that counsel's decision not to consult an expert was unreasonable because the decision was based on an inadequate investigation, challenging the forensic evidence was critical in light of Petitioner's confessions, and trial counsel was aware that Nurse Bell was an inexperienced sexual assault forensic examiner.  Dkt. No. 1 at 25-26.  Petitioner further claims that in light of counsel's deficient performance, there was a reasonable probability that the outcome of trial would have been different because Petitioner's own expert witness could have presented an exculpatory interpretation of the forensic evidence including that the examination results were normal, and the jury would have learned how inadequate Nurse

---

[1] The Court notes that Petitioner argues for the first time in his Traverse that the California Court of Appeal's refusal to issue an order to show cause violated his federal right to due process.  Dkt. No. 17 ("Traverse") at 2-3.  "A Traverse is not a proper pleading to raise additional grounds for relief."  *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  As such, this Court will not address Petitioner's new basis for relief.

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

Bell's examination and conclusions were and heard that the evidence suggested that K.H. recently had sexual intercourse with someone else. Dkt. No. 1 at 37.

As an initial matter, because the state courts did not review this claim on the merits, this Court analyzes Petitioner's claim *de novo*. *See Taylor v. Beard*, 811 F.3d 326, 331 n.3 (9th Cir. 2016) (en banc) (conducting *de novo* review where state courts rejected claim on procedural grounds and did not consider merits).

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* In other words, where the defendant is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 694).

The Court notes that "there is no reason for a court . . . to address both components of the [*Strickland*] inquiry if the defendant makes an insufficient showing of one[;] [i]n particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. In this case, even assuming that counsel's performance was deficient, the Court finds that Petitioner has not demonstrated that there is a reasonable

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

12

probability that but for the error, the result of the proceeding would have been different.

In support of Petitioner's argument that he was prejudiced by counsel's failure to consult and call a sexual assault forensic expert to challenge Nurse Bell's findings, Petitioner provides a declaration from his state post-conviction counsel, himself, and Nurse Judy Malmgren. Dkt. Nos. 1-1 at 103-07, 109-14; 1-2 at 1-2, 73-4.

The Court notes that the trial court limited Nurse Bell's testimony after a [California Evidence Code §] 402 hearing. Dkt. No. 11-5 at 246-76. Specifically, the trial court informed Nurse Bell that she was limited to testifying about "your observations, to define terms, to talk about your qualifications, obviously, to talk about the healing process and that includes rendering opinions as to time and healing. You can talk about the scarring. You can talk in terms of an observation I made is consistent with sexual intercourse, penis in vagina. Findings I've made are consistent with finger in the vagina. You can get into history given to you in terms of sexual intercourse in terms of digital insertion in the vagina. You cannot go beyond that. . . . So there'd be no history presented in terms of oral copulation or anal intercourse, anything along those lines. . . . You're specifically not to get into anything about herpes. . . . And that would mean any conclusion that – or any opinion that, oh, this might be consistent with herpes or getting into observations relating only to herpes. . . . You're not to get into any opinion as to whether or not you think the alleged victim was being truthful." Dkt. No. 11-5 at 282-83.

At trial, Nurse Bell testified that her examination findings were consistent with the history K.H. provided that she'd had sex multiple times including digital penetration, with the most recent time being December 22, 2008. Dkt. No. 11-5 at 301-02. In addition, Nurse Bell stated that it was not possible to determine how many times K.H. had had sex, but based on the physical examination, it had been at least twice. *Id.* at 332. Defense counsel was able to elicit Nurse Bell's opinion that the six tears or lacerations she observed could have happened over some period of time or all at once. *Id.* at 310-11. If a teenager

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

13

was having frequent sex, Nurse Bell would expect the hymen to have more lacerations than K.H.'s examination had shown. *Id.* Defense counsel also pointed out to the jury that Nurse Bell failed to record or photograph the examination, as is the normal protocol, and was therefore testifying based on memory and her medical report. *Id.* at 312. Nothing in Nurse Malmgren's declaration contradicts Nurse Bell's testimony regarding her opinion that K.H. had sex at least twice over some period of time.

Nurse Malmgren's declaration states that she reviewed Nurse Bell's forensic report, the police report, Nurse Bell's testimony both at the 402 hearing and the trial, and the trial testimony of K.H. Dkt. No. 1-1 at 110 ¶ 5. While Nurse Malmgren's declaration criticized the manner in which Nurse Bell conducted and recorded the examination, as well as Nurse Bell's imprecise identifying vocabulary, Nurse Malmgren concluded that Nurse Bell's finding of "multiple clefts" in K.H's hymen cannot be verified because there was no photo documentation and "[e]ven if [Nurse Bell] identified scars on the hymen, there is no way to say what the dates of the injuries were or knowing if they came from unrelated sexual contact." *Id.* at 112 ¶ 6d.1. Nurse Malmgren concluded that in general, forensic nursing cannot determine whether any sexual contact was consensual or nonconsensual, *id.* at 115 ¶ 9, and that at most, Nurse Bell's medical report suggested that "findings may be caused by sexual abuse or other mechanisms," *id.* at 115 ¶ 10. Finally, Nurse Malmgren surmised that "it was entirely possible . . . that any reported healing abrasions were caused by other mechanisms, or unreported recent sexual contact between the patient and some other individual." *Id.* Notably, Nurse Malmgren did not suggest that Nurse Bell was incorrect in her findings. At most, Nurse Malmgren's declaration weakened any strength of Nurse Bell's limited testimony and opinion.

Importantly, Nurse Malmgren's declaration does nothing to affect the damage that Petitioner's police interview, trial testimony, and recorded phone call between Petitioner and K.H. had on the verdict. The transcripts of the police interview, Petitioner's trial

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

14

testimony, and the recorded phone call were contradictory and not credible. Although Petitioner's defense at trial was that he never had any sexual contact with K.H., Petitioner relented during the police interview that he did engage in vaginal and oral sex with K.H., but only because she was the aggressor. Dkt. No. 11-2 at 146-52, 156-61. Petitioner also told his mother that K.H. was the aggressor, even though at trial, Petitioner adamantly insisted that he only told one officer that K.H. pursued him and that Petitioner did not tell that lie to anyone else. In the recorded pretext phone call, K.H. asked Petitioner several times if Petitioner had told her mother "anything about us," and Petitioner stated that he had not and that he would not. Dkt. No. 11-2 at 104-09. The jury clearly found Petitioner's explanations as to his responses to K.H. in the phone call and why Petitioner told the police that K.H. was the initial aggressor not credible.

Moreover, during closing arguments, neither party focused on Nurse Bell's testimony. The prosecution reviewed K.H.'s testimony and stated that Petitioner's police interview was the "heart of the case." Dkt. No. 11-6 at 173-74. In the interview, Petitioner had admitted to multiple acts of sexual intercourse with K.H. *Id.* at 209. On the other hand, Petitioner's theory of defense was that nothing inappropriate happened between him and K.H. Counsel agreed that K.H. had engaged in sex but pointed out that there was no physical evidence that it was with Petitioner. Counsel argued that Nurse Bell's findings were not consistent with K.H.'s testimony that K.H. was frequently having sex over a 3-4 year period. Dkt. No. 11-6 at 220-21.

Finally, it was apparent that the jury was not at all persuaded by Petitioner's theory of defense. The jury began deliberations on May 12, 2011 at 8:48 a.m., and returned with guilty verdicts in just over one hour at 9:49 a.m. that same day. Dkt. No. 11-2 at 75. In light of the strength of K.H.'s testimony, Petitioner's responses in the recorded phone call, Petitioner's police interview, Petitioner's trial testimony, and the short duration of the jury's deliberations, there was no reasonable probability that had counsel consulted or

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

called a sexual assault forensic expert to refute Nurse Bell's findings and testimony, the result of trial would have been different.

Accordingly, Petitioner is not entitled to relief on this claim.

### 4. Denial of request for funding (Claim 3)

Petitioner claims that the trial court violated his right to due process and equal protection when it denied Petitioner's request for funding to appoint a false confession expert. Specifically, Petitioner points out that he was entitled to the appointment of false confessions expert, Dr. Leo, because Petitioner was indigent. Dkt. No. 1 at 39-40. Petitioner also asserts that it was "reasonably necessary" for counsel to consult with Dr. Leo in order to provide adequate representation. *Id.* at 40-43. In the alternative, Petitioner argues that counsel, Mr. David Markham, was ineffective for failing to provide the necessary showing to be granted funding to obtain Dr. Leo. *Id.* at 43-50.

The California Court of Appeal considered this claim on direct review and rejected it:

Prior to trial, defendant filed an ex parte request for funding of a false confession expert. Defendant's counsel [FN5] filed a declaration in which he stated that during defendant's interview with the police, he denied any sexual molestation of K.H. approximately 50 times. Counsel averred that while defendant ultimately admitted committing multiple sexual acts involving K.H., he did so only after he was coerced by law enforcement into confessing to the crimes. Counsel declared that he could not adequately represent defendant without the assistance of a qualified expert witness on false confessions. He included the curriculum vitae for the requested expert, Dr. Richard A. Leo. On defendant's behalf, counsel requested $2,500 in order to hire Dr. Leo. In support of the request, he attached defendant's financial declaration which indicated that defendant had monthly income from unemployment of $1,300 and monthly expenses of $600. The court declined to authorize funds for the expert.

FN5. The motion was filed by David Markham in May 2009. Chris Andrian replaced Markham in March 2010 and conducted the trial.

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

16

It is well settled that "the right to effective assistance of counsel entitles indigent defendants to access to public funds for expert services. [Citations.] [¶] However, it is only necessary services to which the indigent defendant is entitled, and the burden is on the defendant to show that the expert's services are necessary to his defense." (*People v. Gaglione* (1994) 26 Cal. App. 4th 1291, 1304.)

Evidence Code section 730 specifically addresses the court's authority to appoint an expert to assist in the trial of a matter: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required. The court may fix the compensation for these services, if any, rendered by any person appointed under this section, in addition to any service as a witness, at the amount as seems reasonable to the court." In criminal cases, the court is required to order the county to pay the expert's fee. (Evid. Code, § 731, subd. (a)(1).)

Thus, in order to support a request for the appointment of an expert witness, a defendant must show both that he is indigent and that the witness is necessary to his defense. (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319-320; *People v. Worthy* (1980) 109 Cal. App. 3d 514, 520.) The decision whether to grant a defendant's request for the appointment of an expert witness rests within the sound discretion of the trial court. (*People v. Gaglione*, *supra*, 26 Cal. App. 4th at p. 1304.)

To demonstrate a need for the services of an expert, a defendant should support his request by reference to "'"the general lines of inquiry he wishes to pursue, being as specific as possible."'" (*Corenevsky v. Superior Court*, *supra*, 36 Cal.3d at p. 320.) In making a request, a defendant should indicate what assistance an expert could provide and why cross-examination or other means of attacking the People's case would be inadequate in the case. (*People v. Hurley* (1979) 95 Cal. App. 3d 895, 899.)

Here, the record is inadequate to support defendant's claim of indigency. While his financial declaration stated that he received $1,300 in unemployment and had monthly expenses of $600, the balance of $700 could presumably have included a payment toward the $2,500 fee for Dr.

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

Leo. In addition, defendant was represented by retained counsel at trial. [FN6.] The fact that defendant retained counsel was a factor that the trial court could consider in determining whether defendant had established his indigency. (*Tran v. Superior Court* (2001) 92 Cal. App. 4th 1149, 1155 and fn.3; *People v. Worthy*, *supra*, 109 Cal. App. 3d at p. 520 ["We concur in the concept that if defendant is able to pay counsel, by whatever means, his indigency has not been established.") Hence, the record fails to support defendant's claim of indigency.

> FN6. The probation officer's report on defendant's bail status states that defendant owed approximately $30,000 to his parents for his attorney and bail bondsman.

> Further, even if defendant was indigent at the time of trial, his request failed to demonstrate the necessity for an expert witness on false confessions. His counsel's declaration stated only that he required an expert "to properly evaluate defendant's claim that his confessions were coerced by law enforcement." Counsel did not proffer any other explanation or justification for the expert or explain why cross-examination of the pertinent witnesses would not be effective. (*See People v. Hurley*, *supra*, 95 Cal. App. 3d at pp. 899-900 [defendant, who sought expert on eyewitness identification, did not set forth reasons why cross-examination would not be adequate to attack the identifications in the case].) Moreover, this was not a case in which defendant's confession was the key evidence against him. Rather, K.H.'s testimony was central to the prosecution's case, and her testimony was corroborated in part by her mother and by forensic evidence. On this record, the trial court did not abuse its discretion in denying the request.

*Sanders*, 2013 WL 4470551, at *6-*7.

The federal Constitution requires that indigent defendants "have a fair opportunity to present [their] defense." *Ake v. Oklahoma*, 470 U.S. 68, 76, 83 (1985). The Supreme Court has held that indigent defendants are entitled to certain types of assistance, including psychiatric experts under some circumstances. *See id.* However, the Supreme Court has declined to address the extent to which, if at all, the Constitution requires the appointment of a non-psychiatric expert. *See Caldwell v. Mississippi*, 472 U.S. 320, 323-24 n.1 (1985) (declining "to determine as a matter of federal constitutional law what if any showing

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

18

would have entitled [the petitioner]" to the appointment of fingerprint and ballistics experts, where the petitioner "offered little more than undeveloped assertions that the required assistance would be beneficial"). "The Supreme Court has never held . . . that indigent defendants are entitled to funds for other types of expert witnesses." *See Schroeder v. Premo*, No. 15-35713, 712 Fed. Appx. 634, 636-37 (9th Cir. Oct. 26, 2017) (unpublished memorandum disposition) (rejecting claim that the trial court's denial of funding for an eyewitness identification expert violated the federal Constitution). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006). Here, because no "clearly established" Supreme Court law requires funding for the appointment of a false confessions expert, the state court's decision denying funding was not contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Petitioner also argues that the state court's determination that Petitioner did not satisfy the indigency requirement or make an adequate showing of the need of Dr. Leo was an unreasonable determination of facts. 28 U.S.C. § 2254(d)(2). Petitioner raises this argument for the first time in his Traverse, which is improper. *See Cacoperdo*, 37 F.3d at 507.

Nonetheless, even assuming that the argument was properly raised, Petitioner would not be entitled to habeas relief under Section 2254(d)(2). In order to find that a state court's decision was based on "an unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court," *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (internal quotation marks omitted). "[W]here the state courts plainly misapprehend

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

19

or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004). In examining whether a petitioner is entitled to relief under 28 U.S.C. § 2254(d)(1) or § 2254(d)(2), a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Here, Petitioner argues that the California Court of Appeal's finding that Petitioner did not demonstrate indigency or necessity for a false confession expert was unreasonable because the trial court judge had previously approved the appointment of a psychiatrist for Petitioner approximately a week prior. Dkt. No. 17 at 21-22. Petitioner argues that counsel's declaration in support of appointment of a psychiatrist was similar to his declaration in support of appointment of a false confession expert. *Id.* at 22; Dkt. No. 1-6.

Petitioner's argument is unavailing. A state appellate court is "entitled to make its own factual findings unconstrained by what the trial court did." *Williams v. Johnson*, 840 F.3d 1006, 1011 (9th Cir. 2016). Here, the state appellate court noted that Petitioner was represented by retained counsel at trial and had a monthly balance of $700 as reported in his financial declaration. *Sanders*, 2013 WL 4470551, at *7. Both factors weighed against a finding of indigency. *Id.* That the trial court previously appointed a psychiatrist to examined Petitioner does not *per se* make the state appellate court's findings unreasonable. Petitioner provides no other argument to support his claim that the state appellate court's finding of indigency was unreasonable.

Similarly, Petitioner argues that because counsel's declaration in support of appointment of a false confessions expert was similar to that in support of appointment of a psychiatrist, the state appellate court's conclusion that the declaration in support of a false confessions expert was insufficient was unreasonable. However, Petitioner does not

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

20

1    support his argument with any other evidence.  In light of the showing that must be made

2    under California law to warrant appointment of an expert, this Court cannot say that the

3    state appellate court's factual findings were unreasonable under 28 U.S.C. § 2254(d)(2).

4           Petitioner's alternative claim that counsel was ineffective for failing to adequately

5    show the necessity of the appointment of Dr. Leo fares no better.  Dkt. No. 1 at 43-44.

6    Petitioner argues that counsel, Mr. Markham, had a duty to provide as convincing an

7    application for appointment of a false confessions expert as possible, and that because Mr.

8    Markham failed to do so, Mr. Markham was ineffective.  In addition, Petitioner suggests

9    that once the application for a false confessions expert was denied, Mr. Markham should

10   have filed a renewed application.

11          Keeping in mind the standards for demonstrating ineffective assistance of counsel

12   under *Strickland*, here Petitioner again cannot show prejudice.  As stated above, California

13   law requires a showing of both indigency and the need for an expert.  *Sanders*, 2013 WL

14   4470551, at *7.  The state appellate court affirmed the denial of an appointment of a false

15   confessions expert on the grounds that Petitioner failed to show either prong.  *Id.*  Thus,

16   even assuming that counsel's declaration supported a need for a false confessions expert,

17   the state appellate court's finding that Petitioner did not demonstrate indigency

18   demonstrates that there was no reasonable probability that the outcome of the motion or

19   the trial would have been different.

20          In addition, Mr. Markham had been relieved as counsel for Petitioner more than a

21   year before Petitioner's case even went to trial.  A previous attorney for Petitioner had

22   secured funding for a psychiatrist, however, trial counsel, Mr. Andrian, did not present or

23   utilize any expert psychiatric evidence at trial.  In fact, Mr. Andrian did not rely on any

24   expert testimony in his defense strategy.  There is no indication that Mr. Andrian would

25   have used a false confessions expert at trial even if Petitioner had gotten funding for such

26   an expert, weakening Petitioner's argument that the failure to secure funding for a false

27   Case No. 17-5008 BLF
     ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF
28   APPEALABILITY; DIRECTIONS TO CLERK

United States District Court
Northern District of California

21

confessions expert had any negative impact on the result of trial.

Further, the record shows that several unsolicited statements Petitioner made during his police interview possessed striking similarities to K.H.'s testimony which suggests that Petitioner's admissions regarding sexual contact with K.H. were not false. That is, even assuming that a false confessions expert had testified, there is no reasonable probability that Petitioner would have received a more favorable result.

For example, the first incident Petitioner admits to the police is the tickling incident when Petitioner and K.H. lived at the house on Buckeye. Dkt. No. 11-2 at 123-26. Petitioner initially denied to the police that anything sexual occurred, but later admitted that K.H. had straddled him, grabbed his penis, and came onto him. *Id.* and 130-31, 142-43. Petitioner also stated that K.H. and her mother believed that Petitioner was touching K.H. inappropriately. *Id.* at 125. At trial, K.H. had testified that Petitioner began tickling her and then put his hands down her pants and underwear. Dkt. No. 11-5 at 63. After Petitioner stated during the police interview that the events were embarrassing to talk about, Petitioner admitted that the "right thing to do" would have been to tell his wife about the sexual contact and get some kind of counseling. Dkt. No. 11-2 at 144.

K.H. also testified at trial that while living on Verna Way in Lucerne, after one incident of having sex with Petitioner, Petitioner put the used condom in a cigarette box and threw the box into the outside garbage. Dkt. No. 11-5 at 106-07. When confronted about this story during the police interview, Petitioner clarified that the condom wrapper had been on the floor and Petitioner put it in a container, but not in the cigarette box. Dkt. No. 11-2 at 159-60.

The Court also notes that Petitioner's statements to the police confirming sexual contact with K.H., but pinning K.H. as the aggressor were consistent with Petitioner's statement to his mother in which he stated "[K.H. would] come after me sexually when she wanted something." Dkt. No. 11-6 at 160.

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

22

In light of the similarities between Petitioner's statements during the police interview and K.H.'s version of events, as well as Petitioner's admission to his mother, the Court finds that testimony from a false confessions expert was not likely to produce a reasonable probability that the jury would have had a reasonable doubt respecting guilt.

Based on the foregoing, Petitioner is not entitled to habeas relief based on this claim.

### 5.        Ineffective assistance of appellate counsel (Claim 4)

Petitioner alleges that appellate counsel was ineffective for filing an untimely state habeas petition. Dkt. Nos. 1 at 51-53; 17 at 33-36. Petitioner's allegation appears to be made solely to support his arguments that Claims 1, 2, and 5 should be excused from procedural default. It does not appear that Petitioner intended to raise a stand alone claim that appellate counsel was ineffective for failing to file a timely state habeas petition.

To the extent that Petitioner did intend to raise such a stand alone claim, it lacks merit. A claim of ineffective assistance of counsel on state or federal collateral review is not cognizable on federal habeas corpus review. *See* 28 U.S.C. § 2254(i). After a first right of appeal, there is no constitutional right to an attorney in any other state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 755-57 (1991). Where no constitutional right to counsel exists, there can be no claim for ineffective assistance. *See id.* at 757.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 6.        Cumulative effect of errors (Claim 5)

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a Petitioner so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). Where there is no single existing constitutional error, however, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d

Case No. 17-5008 BLF
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK

23

United States District Court
Northern District of California

939, 957 (9th Cir. 2002). Here, Petitioner has failed to establish a single instance of constitutional error. Accordingly, there are no errors to aggregate. Petitioner's claim of cumulative error lacks merit.

## IV.  CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated:___8/8/2018___

BETH LABSON FREEMAN
United States District Judge